## Jones v. Jones.

(Decided November 13, 1928.)

### Appeal from Whitley Circuit Court

1. **Divorce.**—In action by wife for divorce from bed and board, in which husband recovered absolute divorce, evidence that wife had $500 originally which went into purchase of $1,500 lot, remainder of which was paid for by husband, that husband erected $4,500 house on lot and owned other realty, that there were debts

amounting to over $10,000 secured by mortgages against realty, that husband received $4,500 in bankruptcy of his business, held to sustain award of $7,837 and $500 attorney fees to wife, on condition that she convey her interest in realty.

2. Divorce.—Error, if any, by chancellor in settling property rights, when adjudging separation from bed and board, cannot be complained of by wife suing for divorce from bed and board, where husband obtained absolute divorce on counterclaim, and final judgment thereof approving settlement of property rights cured error of first judgment.

3. Divorce.—Award of $500 to attorneys for wife suing for divorce, by chancellor familiar with compensation paid attorneys for similar services, will not be disturbed on appeal.

POPE & BROWNING, STEPHENS & STEELY and T. B. CULTON for appellant.

J. B. WALL and TYE, SILER, GILLIS & SILER for appellee.

OPINION OF THE COURT BY JUDGE LOGAN—Affirming.

Appellant, Lizzie V. Jones, and appellee, John W. Jones, were married on the 1st day of January, 1899. They resided for a while at Williamsburg before moving to Corbin, where they have since resided. About the year 1920 appellant became suspicious and jealous of appellee because of his reputed association with a woman. As this was her only serious complaint against him until near the conclusion of this litigation in the lower court, we deem it necessary to briefly state the facts. About the year 1920 appellee, with other gentlemen, organized a garage company in the city of Corbin. $20,000 or more was paid in as capital. The husband of the woman who aroused the suspicion and jealousy of appellant contributed $5,000 to the capital investment. He was a member of the board of directors. His wife occasionally went to the office of the garage company, and it is testified to that there was some talk about an intimacy between her and appellee. Appellant testified that she had a subconscious feeling that there was something wrong between them, and that she had observed a guilty look on their faces when in the presence of each other. On one occasion the woman requested appellee to make some slight repair on her automobile. Appellant saw this, and it occurred to her, so she testified, that the woman should have called a mechanic to do the work. At another time appellant saw her husband hand the woman a towel with which to

wipe the face of a small child whose face the woman had washed. Again appellant caught her husband watering some flowers which the woman had left in the office of the garage. Others saw appellee standing by the automobile of the woman, while she was sitting in it, with his foot on the running board, apparently talking to her. Another witness testified that she saw appellee and the woman talking together on the street, and as she passed the woman turned her face away. It was of frequent occurrence that the husband of the woman, in company with her, and with appellee and appellant, drove together in the automobile of one or the other of the parties. A friendliness seemed to exist between the two families. Appellant testified, however, that during the period between 1920 and 1922 she had a subconscious feeling that something was wrong, and she acted accordingly.

The husband of the woman died in 1922, leaving her all of his property by will. She thereby became interested in the garage company, and took the place of her husband in that organization, with the addition that she was employed as a bookkeeper to work in the office. Appellant was more deeply suspicious after 1922, and, either consciously or unconsciously, she put spies to work. Some of the neighbors, both men and women, became interested in the domestic relations existing in the home of appellant and appellee. They commenced watching with careful scrutiny the conduct of the woman and appellee, but with all of their diligence there is no witness who testified that he saw any act on the part of the woman which in any way reflected on her standing as a good woman. It may also be said that there is no statement in the evidence reflecting upon the morals of appellee.

It is testified that the woman often took appellee in her car and drove him to and from his home, or that he took the woman in his car and drove her to and from her home. There is also testimony that they were seen together in an automobile in the city of Corbin on more than one occasion, but the evidence is not very definite about the automobile activities of appellee and the woman in the city of Corbin. There was considerable evidence that the woman had been seen on more than one occasion driving on the public roads leading out of Corbin, and that soon thereafter appellee had been seen

driving on the same road. On one occasion witnesses saw the woman on the road when something had gone wrong with her automobile, and appellee came along, stopped and fixed it for her, and then got in his automobile and drove away in one direction and she drove away in another. A number of witnesses testified that they had seen them on the public road driving at the time between Corbin and London, but whether the trips were one with many witnesses along the road, or many with few witnesses, cannot be determined from the evidence. Witnesses all up and down the road testified, and as none of them identified the particular date, or dates, on which they saw these two driving together, the court is left in much doubt as to how frequently they drove out on the public road. There were some witnesses particularly active in trying to find out what was going on between appellee and the woman. One of these was some kind of doctor, and she testified that she had heard much and knew much which she could not reveal because of the professional manner in which she received the gossip relating to her neighbors, but she was frank enough to admit that she did some looking about on her own responsibility, and she made known to the court her discoveries on her expeditions. On one occasion she testified with directness that she saw appellee and the woman sitting in an automobile late at night in the mouth of an alley back of the Masonic Building. She passed by as they were thus sitting and recognized them at the time, but she desired to be certain beyond the peradventure of any doubt, so after she had passed them she turned back and approached the automobile and took a closer view. She testified that she could not be mistaken about what and whom she saw, although she did not claim that they were doing anything other than talking.

Two witnesses at least testified that they saw appellee and this woman on a railroad train going towards Louisville, sitting fronting each other in one of the coaches. Another witness testified that he saw them one day in Louisville walking on Fourth street.

These incidents, suspicions, and surmises constitute the bulk of the evidence in favor of appellant up to the real crisis which was reached in 1926 when there came into her possession certain pictures of the woman in a

bathing suit, and also pictures of appellee in a bathing suit. She testified that the postman delivered to her home a package addressed to her husband which she opened. She discovered a number of pictures of the woman dressed in a bathing suit, and also pictures of her husband dressed in a bathing suit. She immediately carried these pictures to her attorney, as well as the films which were inclosed in the package. In some manner appellee learned of her having obtained possession of the pictures, and he made complaint at the post office, and a postal inspector was directed to investigate. He obtained the pictures from appellant, but did not obtain the films. Appellant caused new pictures to be made from the films, and they are placed in evidence. Appellant left her home and went to the home of a relative, where she has since remained.

For five years before she instituted her suit for alimony she admits that she had been rather vigorous in her protests to her husband about his association with this woman, and the matter became so acute that her husband occupied a room separate from her for a time. Again he took a room elsewhere and remained away for some months. While he was away from home she was ill, and the neighbors had to look after her wants.

The record shows very clearly that appellant was a highly nervous woman, and that she was suspicious and jealous. The record also shows that appellee was not as considerate of her condition as he should have been. He was busy trying to make a living, and doubtless resented the mental attitude of his wife, as well as her verbal castigations. Instead of trying kindness commensurate with her unnatural mental condition, it appears that he sulked.

Appellee admitted in his testimony that he had driven with the woman a number of times, but he claimed that it was necessary in their business relations, as they were engaged in the conduct of an automobile business which required their being together on frequent occasions. He denied that he was ever on a railroad train with the woman, or that he saw her in Louisville. As to the incident related by the woman doctor which happened back of the Masonic Building, he denied that it ever took place and proved abundantly that the good doctor was

mistaken in her statement that she saw him with the woman at the time and place. A young lady testified that she had requested him to take her home, and that she was in the automobile with him at the time and saw the woman doctor peering into the automobile. He also proved, by two or three young men who came by the automobile at the time and stopped, that the testimony of the young woman who said she was with him was true. He testified that the pictures of him in a bathing suit were taken by one of his friends, a gentleman who testified to the same fact, and that the woman was not present at the time. He also testified that he was not present when the pictures of the woman were taken. He had placed the films taken of him in his office. The automobile of the woman needed repairs, and when the mechanic was working on it he took out some films which proved to be those of the woman in a bathing suit. When the films were sent away to be developed, they were mixed in some way and sent away together. His mail was all delivered at his office, but this batch of pictures was delivered at his home.

The court first granted a divorce from bed and board and awarded appellant alimony in the sum of $75 a month. Later he entered a judgment awarding her a lump sum of $7,500 as alimony, upon the condition that she convey to her husband her entire interest in the real estate, including her contingent dower interest. The evidence as to the value of the property owned is not entirely satisfactory. They had little when they moved to Corbin. Appellant had $500 which went into the purchase of a lot at $1,500, her husband paying the remainder. The lot was deeded jointly to them. Later appellee erected a house on the lot, and the proof shows that it was worth about $4,500 at the time of the trial. He owned other real estate, the value of which is hard to arrive at from the record, as some witnesses placed the value at twice what other witnesses placed it. There were debts amounting to more than $10,000, some or all of them secured by mortgages against the real estate. The garage business was wound up in bankruptcy, and the appellee received $4,500 from that source. In addition to the $7,500 which was awarded to appellant, she was also awarded $337, which remained unpaid under the previous order of the court. $250 was allowed as a

fee to her attorneys, and, in addition, appellee was required to pay the cost. Upon a consideration of the whole case we have reached the conclusion that the lower court was liberal with the appellant, and we will not disturb the judgment of the chancellor.

It is argued by counsel for appellant that the chancellor was without authority to settle property rights when he adjudged a separation from bed and board. Accepting their argument as true, appellant had no reason to complain, as in the same proceeding at a later date on a counterclaim filed by appellee he was awarded an absolute divorce, and that judgment approves the settlement of property rights in the previous judgment. The final judgment cured any error in the first judgment of the court. In the final judgment the court allowed an additional $250 at attorney fees for appellant. Counsel for appellant complain that an allowance of $500 in this case was not enough for her attorneys. The record shows that they performed much labor, and that they discharged their duties well, but the chancellor is familiar with the compensation paid to attorneys for similar services in his court, and we will not disturb his judgment.

There is a cross-appeal by appellee. He contends that the award to appellant was too much taking into consideration the property which he owned. We are satisfied that the amount awarded to appellant was at least a fair proportion of appellee's net worth, but we are unwilling to say that it was more than a fair proportion. Therefore, we will not sustain the contention of appellee that the award was too high.

Judgment affirmed on both the original and cross appeals.